876 So.2d 877 (2004)
Christina TORREJON, Individually and as Personal Representative of the Estate of Joseph Torrejon
v.
MOBIL OIL COMPANY, Individually and as Successor to Socony Vacuum Oil Company and Socony Mobil Oil Company; Babcock & Wilcox Company; Combustion Engineering, Inc.; The Flintkote Company; Foster Wheeler Corporation; Garlock Inc.; et al.
No. 2003-CA-1426.
Court of Appeal of Louisiana, Fourth Circuit.
June 2, 2004.
*879 Scott R. Bickford, John R. Martzell, Christopher H. Sherwood, Tiffany G. Chase, Regina O. Matthews, Martzell & Bickford, New Orleans, LA, for Plaintiff/Appellee.
Gary A. Bezet, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., Baton Rouge, LA, and Andrew L. Plauche', Jr., Kenan S. Rand, Jr., Plauche', Maselli, Landry & Parkerson, L.L.P., New Orleans, LA, for Defendant/Appellant (Mobil Oil Company).
*880 (Court composed of Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, SR., Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
This is a maritime wrongful death suit. From a judgment notwithstanding the verdict ("JNOV") in favor of the plaintiff, Christina Torrejon, the defendant, Mobil Oil Company ("Mobil"), appeals. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
In 1938, Joseph Torrejon, Mrs. Torrejon's deceased husband, began working as a merchant mariner aboard various vessels in various crew positions. From 1941 to 1949 and in 1956, he sailed on Mobil vessels. During that time, according to plaintiff's calculations, Mr. Torrejon spent 2,066 days working and residing on Mobil vessels. During that time, he allegedly was required to maintain and to repair equipment surrounded with asbestos and to tear out and to repair asbestos-containing insulation. As a result, he allegedly was exposed to substantial amounts of asbestos dust.
In addition to maritime employment, Mr. Torrejon's career also included several land-based employments at which he also may have been exposed to asbestos-containing products.[1]
In April 1994, at age seventy-seven, Mr. Torrejon died of mesothelioma, which the parties stipulated was caused by his exposure to asbestos. In March 1994, a month before he died, Mr. Torrejon, who was then residing in Arizona, filed a petition to perpetuate testimony in Arizona state court. In that petition, he represented that his life expectancy was less than a month and that he reasonably believed that his occupational exposure was a contributing factor to his asbestos-related disease. He further represented that he, or his surviving spouse, was planning to bring suit against the manufacturers of the asbestos-containing products to which he was exposed. He still further represented that he needed to perpetuate his testimony on three particular points: (i) the employment sites at which he was exposed to asbestos, (ii) the types and manufacturers of asbestos-containing products to which he was exposed,[2] and (iii) the fact that he had not smoked tobacco within the last thirty years. Attached to the perpetuation petition was a summary of his pertinent employment history; that summary listed the following pertinent information:[3]

*881  Merchant Mariner  1938  as an Oiler he was exposed to asbestos pipe, wrap, and mud.
 Steam Ships  S/S STANVAC CAPE TOWN, S/S MAGNOLIA, and S/S SOCONY-VACUUM (Mobil's vessels)  worked in boiler rooms from 1941 to 1949 as Oiler; Machinist; First, Second and Third Assistant Engineer; and Fireman/Watertender.
 New York City Shipyard  did machinist work for a three or four day period and then went back to sea. Mr. Torrejon was uncertain as to the length of time he was there.
 General Electric  worked on boilers and turbines and the heating and cooling system.
 Colonial House (a hotel) in Las Vegas  1959 to early 1960's-worked in the boiler room doing maintenance.
Besides the perpetuation petition, the only other direct evidence of Mr. Torrejon's asbestos exposure was provided by Dr. Robert Hirsch's testimony. Dr. Hirsch, a general internist, testified that he was Mr. Torrejon's treating physician from January 3, 1994 until his death on April 22, 1994. According to Dr. Hirsch, Mr. Torrejon informed him on his first visit, as part of the patient history, that he worked with asbestos when he was a ship's engineer during World War II. Dr. Hirsch testified that Mr. Torrejon did not give him any other information regarding potential occupational exposure to asbestos. Dr. Hirsch documented Mr. Torrejon's statement in his report dated January 3, 1994, which reads: "[Mr. Torrejon] worked with asbestos when he was a ship's engineer during World War, II. Subsequent to that he was a restaurant owner.... He smoked briefly during the 1940's." Dr. Hirsch testified that Mr. Torrejon was mentally alert at the time he obtained that initial patient history from him. Although Dr. Hirsch testified that his working diagnosis of Mr. Torrejon was lung cancer, the autopsy revealed that lung cancer was a misdiagnosis and that the correct diagnosis was mesothelioma.
In March 1995, Mrs. Torrejon, as her deceased husband's personal representative, filed the instant maritime wrongful death action in Orleans Parish Civil District Court. In her original and amended petition, she named two groups of defendants: (1) Mr. Torrejon's Jones Act employer: Mobil Oil Company, individually and as successor to Socony Vacuum Oil Company and Socony Mobil Oil Company; and (2) eight manufacturers of asbestos-containing products: Babcock & Wilcox Company; Combustion Engineering, Inc.; Foster Wheeler Corporation; Combustion Engineering, Inc.; The Flintkote Company; Garlock Inc.; Owens-Corning Fiberglas Corporation; and Owens-Illinois, Inc. As to the latter defendants, plaintiff's claims were premised on maritime products liability. Although plaintiff's petition included both a Jones Act and an unseaworthiness claim against the Jones Act employer (i.e., Mobil), plaintiff pursued only the Jones Act claim at trial.
As to Mobil's Jones Act liability, plaintiff alleged that Mr. Torrejon was exposed to a substantial amount of asbestos while sailing as a seaman on various Mobil vessels in various capacities.[4] Plaintiff also alleged *882 that Mobil knew or should have known of the dangers posed by asbestos,[5] yet failed to prevent asbestos dust exposure, failed to use proper work practices, and failed to warn him of the dangers.
Mobil not only answered, generally denying plaintiff's allegations, but also filed a third-party demand against nine manufacturers of asbestos-containing products. Mobil's third party demand, filed in March 2002, sought indemnity, contribution, or both for the claims plaintiff asserted in this case as well as for the claims she asserted in the parallel federal suit she filed in Arizona.[6] Indeed, Mobil's third-party demand incorporated plaintiff's allegations in the Arizona complaint.
In November 2002, an almost two-week jury trial was held in the instant matter. Due to settlements and dismissals, Mobil was the sole remaining defendant at the time of trial. At trial, the parties stipulated to the following facts:
 Mr. Torrejon was born on October 14, 1916; and he died on April 22, 1994. (He was seventy-seven at the time of his death.)
 Mobil Oil is the successor-in-interest to both Socony-Vacuum Oil Company and Socony Mobil Oil Company, and Mobil and its predecessor corporations were members of the National Safety Council from 1930 to 1960, inclusive.
 From 1941 to 1949 and in 1956, Mr. Torrejon sailed on the following eight vessels owned by Mobil or its predecessor corporations; STANVAC CAPE TOWN, SOCONY VACUUM, SACONNET, TATARRAX, SAUCON, SHABONEE, MAGNOLIA, and ECLIPSE. His rankings were: Oiler; Machinist; Fireman/Watertenderer; and First, Second and Third Assistant Engineer.
 Mobil or its predecessor corporations were Mr. Torrejon's Jones Act employers during the time that he sailed aboard those eight vessels.
 Foster Wheeler boilers were on the following vessels: MAGNOLIA, SACONNET, SOCONY VACUUM, and STANVAC CAPE TOWN.
 To a reasonable degree of medical certainty, Mr. Torrejon developed a disease known as malignant pleural mesothelioma and died as a result of that disease.
 Mr. Torrejon's medical expenses incurred in the treatment of that disease were $20,862.77, which did not include medications or medical equipment. Mr. Torrejon's funeral and burial expenses were $2,365.15.

*883  Plaintiff is pursuing claims against Mobil under the Jones Act and the general maritime law, and is seeking damages for his physical and mental pain and suffering, medical expenses and funeral expenses as allowed under the Jones Act and general maritime law. Plaintiff is not entitled to pursue claims for punitive damages under the Jones Act and general maritime law against Mobil.
 Plaintiff has settled claims for damages with about a dozen manufacturers or their settlement trusts.
Additionally, in response to plaintiff's motion for directed verdict on the issue, Mobil stipulated that Mr. Torrejon's contraction of mesothelioma was caused by his exposure to asbestos.[7]
At the close of trial, the jury answered the special interrogatories as follows:
1. Was the defendant, Mobil Oil Company, negligent in exposing Joseph Torrejon to asbestos?
 X Yes ___ No
If your answer to question No. 1 is "Yes", answer the next question. If your answer to question No. 1 is "No", sign the verdict form and return to the courtroom.
2. Was the defendant, Mobil Oil Company's negligence a cause of plaintiff's injuries?
 ___ Yes X No
If your answer to question No. 2 is "Yes", answer the next question. If your answer to question No. 2 is "No", sign the verdict form and return to the courtroom.[8]
On November 20, 2002, the trial court entered judgment in accord with the jury's verdict, dismissing plaintiff's claims against Mobil. In response, plaintiff filed a motion for JNOV, or, in the alternative, a motion for new trial. Following a hearing on the motions, the trial court denied plaintiff's motion for new trial, but granted her motion for JNOV. The trial court rejected Mobil's claim for a reduction of liability based on the settling manufacturers' liability, finding Mobil failed to satisfy its burden of establishing the manufacturer's liability. The trial court rendered judgment awarding plaintiff $1.8 million dollars in general damages and $35,917.21 in special damages, for a total of $1,835,917.21 in damages. Mobil filed a motion for new trial, asserting two legal errors: (1) improper inclusion in the general damage award of an award for loss of society damages, which are not allowed under the Jones Act; and (2) improper award of judicial interest from the date of original demand. Plaintiff also filed a motion to amend or clarify the judgment for the same two reasons. The trial court denied Mobil's motion for new trial as to the damages issue, but granted its motion as to the interest issue. The trial court then entered an amended judgment on plaintiff's JNOV motion. From that judgment, Mobil appeals.
On appeal, Mobil assigns as error the following rulings by the trial court: (i) its grant of plaintiff's motion for JNOV; (ii) its finding that Mobil failed to prove fault on the settling manufacturers's part and thus to reduce Mobil's liability by the percentage of fault allocated to those manufacturers; and (iii) its denial of Mobil's *884 motion for new trial on the damages issue (i.e., its inclusion of an improper item of damages  loss of society  in its general damage award).

JNOV
Because the standards for JNOV are procedural, state courts exercising concurrent maritime jurisdiction apply the state JNOV standards. See Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 95. The rules governing JNOV are set forth in La. C.C.P. art. 1811. Article 1811 authorizes a trial court to grant a JNOV motion "on the issue of liability or on the issue of damages or on both issues." La. C.C.P. art. 1811(F). Article 1811, however, is silent on the standard to be applied in ruling on a JNOV motion. Since Article 1811 was modeled after the Federal Rules of Civil Procedure, Rule 50, Louisiana courts have looked to the federal jurisprudence for guidance in determining the standard for deciding a motion for JNOV. Martin v. Heritage Manor South Nursing Home, XXXX-XXXX, p. 6, n. 6 (La.4/3/01), 784 So.2d 627, 632 (citing Scott v. Hospital Service Dist. No. 1 of St. Charles Parish, 496 So.2d 270 (La.1986)).
Quoting Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969), the Louisiana Supreme Court in Scott, articulated the standard for JNOV as follows:
When "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied."
Scott, 496 So.2d at 273-74 (quoting Boeing, 411 F.2d at 374 and collecting federal cases). In Joseph v. Broussard Mill, Inc., XXXX-XXXX (La.10/30/00), 772 So.2d 94, the Supreme Court reiterated that same standard and added that "[i]n making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party." Joseph, XXXX-XXXX at pp. 4-5, 772 So.2d at 99 (citing Anderson v. New Orleans Pub. Serv. Inc., 583 So.2d 829, 832 (La.1991)); Robinson v. Fontenot, XXXX-XXXX, XXXX-XXXX (La.2/7/03), 837 So.2d 1280. Moreover, the court further noted that "[t]he [JNOV] motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." Joseph, XXXX-XXXX at p. 4, 772 So.2d at 99.
A motion for JNOV is subject to a stricter standard than a motion for new trial. The reason for this stricter standard is based on the drastic difference between the outcome of granting a JNOV as opposed to granting a new trial. Granting the latter motion results simply in a new trial; granting the former motion results in depriving the parties of their right to have a jury decide all disputed issues. As two commentators explain, "[t]he important distinction between a JNOV and a judgment granting a new trial is that a JNOV reverses the jury's award and makes the apparent winner the loser, while a judgment granting a new trial merely erases the jury verdict (or trial court judgment) and puts the parties in the positions they occupied prior to the trial." 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 13.4 (1999). In short, the stringent *885 standard for a motion for JNOV is based upon the principle that "`[w]hen there is a jury, the jury is the trier of fact.'" Joseph, XXXX-XXXX at pp. 4-5, 772 So.2d at 99 (quoting Scott, 496 So.2d at 273).
Likewise, the federal commentators have noted that unlike a motion for new trial which the trial court has great discretion to determine if the verdict is contrary to the law or evidence, on a motion for JNOV (now termed under Rule 50 as a judgment as a matter of law),[9] "`[the trial judge] has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue.'" Martin, XXXX-XXXX at p. 6, 784 So.2d at 632 (quoting 9A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, § 2524 (1995)).
In reviewing a JNOV on appeal, a two-part inquiry is imposed. First, the appellate court must determine if the trial judge erred in granting the JNOV. This is done by using the same criteria that the trial judge applies in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Martin, XXXX-XXXX at p. 6, n. 7, 784 So.2d at 632; Anderson, 583 So.2d at 832; Joseph, XXXX-XXXX at p. 5, 772 So.2d at 99. Second, "[a]fter determining that the trial correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review." Martin, XXXX-XXXX at p. 6, n. 7, 784 So.2d at 632 (citing Anderson, 583 So.2d at 832).
Mobil acknowledges that the trial court correctly recited in its reasons for judgment the governing JNOV standard, but argues that the trial court erred in applying that standard. Mobil contends that the record supports the jury's reasonable finding that Mobil's negligence did not cause Mr. Torrejon's injuries. In support of that contention, Mobil provides the court with an illustrative list of evidence it contends supports the jury's reasonable finding; to wit:
 Statements made by Mr. Torrejon and plaintiff in the perpetuation petition and the [Arizona federal court] Complaint that Mr. Torrejon's exposures to asbestos at land-based employments after he sailed in the merchant marine caused his cancer.
 Expert testimony from pathologist Dr. John E. Craighead that Mr. Torrejon's exposures to asbestos at his land-based employments after he sailed in the merchant marine could have exceeded any exposures he might have had on a Mobil vessel and that those exposures alone could have caused his injuries.
 Evidence of Mr. Torrejon's exposures to asbestos on non-Mobil vessels when he sailed in the merchant marine and sailed for the U.S. Army during World War II. (See testimony of Dr. Robert Hirsch, Mr. Torrejon's treating physician in Arizona, and testimony of Dr. Charles R. Cushing).
 Expert testimony of Dr. Francis Weir, an industrial hygienist and toxicologist, that not all exposures to asbestos contribute to disease.

*886  Expert testimony from Dr. Cushing that the substantial ventilation on the Mobil vessels on which Mr. Torrejon sailed would completely remove any dust created by work on those vessels in less than two (2) minutes.
 Expert testimony from Dr. Cushing that the Mobil vessels on which Mr. Torrejon sailed were fairly new and would have required only infrequent repair work on insulation and that Mr. Torrejon's duties on Mobil vessels would have afforded him little occasion to perform any insulation repairs.
 Testimony from Mr. John Spencer, an expert in industrial hygiene, that repairs to insulation aboard merchant ships were infrequent and that any potential exposures to asbestos at those times were likely below the current OSHA standards.
Simply stated, Mobil's position is that there was an abundance of evidence presented at trial that Mr. Torrejon's Mobil exposures were negligible and that he had significant non-Mobil exposures. Mobil stresses that Mr. Torrejon worked on relatively new vessels, having an average age of slightly over three years, where the need to repair asbestos-containing insulation was minimal; that he worked at other land-based employments at which plaintiff claimed in the Arizona complaint that Mr. Torrejon was exposed to asbestos; and that Dr. Craighead testified that Mr. Torrejon's exposures at those other employment sites alone could have caused his mesothelioma. Mobil contends that the jury reasonably could have found that it was negligent in exposing Mr. Torrejon to even "de minimus" asbestos, yet found such exposures did not cause his mesothelioma.
Although Mobil acknowledges that the Jones Act causation standard is featherweight, it argues that even a featherweight burden must still be met and may be overcome. Mobil stresses that the two jury interrogatories, quoted earlier, implicitly recognize this point. Those interrogatories authorize the jury to find Mobil negligent by answering the first interrogatory in the affirmative, yet to find its negligence was not a cause of Mr. Torrejon's contraction of mesothelioma by answering the second interrogatory in the negative. Mobil argues that the jury's reasonable fact finding of no causation was both factually and legally sound and should be reinstated.
Plaintiff counters that since this is not a products liability claim, but rather a Jones Act claim, she did not have to prove whose asbestos caused Mr. Torrejon's injury; rather, she only had to prove that Mobil was negligent in exposing Mr. Torrejon to asbestos and that Mobil's negligence contributed, however slightly, to his injury. Plaintiff stresses that both medical doctors who were competent to render an opinion on causation  her own expert, Dr. Victor Roggli, and Mobil's expert, Dr. John Craighead  opined that Mr. Torrejon's occupational exposure to asbestos while sailing on merchant marine vessels was a cause of his mesothelioma. Moreover, plaintiff contends that the jury erred in failing to find she met her Jones Act burden of proving slight causation given the stipulations coupled with the following evidence:
 Mobil's expert, Charles Cushing, testified that as a machinist on a vessel, Mr. Torrejon might have an occasion to work with asbestos containing material in his daily duties performing repairs on ships.
 Joseph Rivera, a former Mobil employee and retired merchant seaman who sailed for over forty years on the same ships and sisters ships as Mr. Torrejon sailed, testified consistently with Mr. Cushing regarding what a machinist's *887 job was on board Mobil's ships: machinists repaired pipes, which included removing asbestos-containing insulation. Mr. Cushing also stated that asbestos-containing insulation was used on Mobil's ships on which Mr. Torrejon sailed.
 Medical evidence established that Mr. Torrejon had asbestos-caused pleural plaque on his lungs, which both Dr. Roggli and Dr. Craighead agreed was the result of not just some exposure but an "occupational exposure" far above ordinary background levels.
 Dr. Craighead also testified that Mr. Torrejon's exposure caused his mesothelioma and that more likely than not his exposure occurred while he was aboard vessels in the 1940's and 1950's.
Plaintiff further contends that even assuming, as Mobil contends, Mr. Torrejon was exposed to asbestos elsewhere than on Mobil vessels, the jury question presented was whether the Mobil exposures were "a" cause of Mr. Torrejon's mesothelioma, not "the" cause. Plaintiff cites Dr. Roggli's testimony that mesothelioma is a dose-responsive disease, which means that the more a person is exposed, the greater his risk of contracting the disease. Plaintiff posits that "any" exposure above background becomes a causative factor in producing the disease and that each additional exposure simply exacerbates the prior exposure.
Agreeing with plaintiff, the trial court in its amended reasons for judgment stated:
There is sufficient evidence to establish that Mobil was negligent in exposing Mr. Torrejon to asbestos during his employment aboard Mobil's vessel. The expert testimony of Dr. John Craighead and Dr. Victor Roggli confirmed that this exposure was responsible for Mr. Torrejon's contraction of mesothelioma. There was no evidence presented to refute the doctor's testimony. Although the record includes claims that another entity may have exposed Mr. Torrejon to asbestos, such claims do not negate the fact that Mobil's negligence was a substantial cause in the injuries complained of.
Under a substantial factor inquiry there can be more than one cause in fact, making multiple wrongdoers liable.... As such, it logically follows that a shipowner's negligence under the Jones Act need not be the sole legal cause of an injury to result in liability, but may merely be a contributing cause, or a "slight cause." In Gautreaux [v. Scurlock Marine, 107 F.3d 331 (5th Cir.1997)], the Fifth Circuit clarified a plaintiff's standard of causation for damages in Jones Act negligence cases. That court explained that in Jones Act negligence matters there is a reduced standard of causation between the employer's negligence and the employees [sic] injuries. Id. at 335. In accordance with that court's interpretation, the test of causation under this section is a more lenient measure of legal cause, i.e., a plaintiff's burden to establish causation is "featherweight".
In the instant case, the record reveals that the parties stipulated that Mr. Torrejon's mesothelioma was caused by asbestos exposure. Therefore, the Court finds that the jury's determination that Mobil did not cause Mr. Torrejon's injuries is completely absent of evidence, inferences, and pertinent law to support it, thereby warranting the plaintiff's JNOV motion.
We find the trial court did not err in granting plaintiff's motion for JNOV. The evidentiary facts upon which the trial court's JNOV decision was based were largely undisputed. The parties stipulated that Mr. Torrejon died as a result of mesothelioma *888 and that his mesothelioma was caused by exposure to asbestos. The jury made a factual finding that Mobil was negligent in exposing Mr. Torrejon to asbestos and that finding is not contested. Under these circumstances, it was not error for the trial court to grant JNOV to apply the applicable law to those undisputed facts. See Stafford v. Unsell, 492 So.2d 94, 97 (La.App. 1st Cir.1986)(holding that it is proper to grant JNOV when the issues are predominately legal ones, which are clearly within the trial court's province); Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162, 1166 (La.App. 3rd Cir.1983).[10]
The applicable law in this case is the Jones Act. To impose liability under the Jones Act upon a ship owner, a plaintiff must prove not only an injury but also that the negligent act or omission was a cause of his injury. In this case, both the injury and the employer's, Mobil's, negligence are not disputed. The sole dispute is whether Mobil's negligence caused Mr. Torrejon's injury, i.e., contraction of mesothelioma.
As noted earlier, the only direct evidence regarding Mr. Torrejon's exposure was provided in Mr. Torrejon's perpetuation petition and Dr. Hirsch's testimony regarding the initial history Mr. Torrejon gave to him. The circumstantial evidence regarding his exposures, as Mobil emphasizes, was conflicting; however, the undisputed factual finding by the jury that Mobil negligently exposed Mr. Torrejon to asbestos renders that conflicting evidence irrelevant. The relevant evidence on causation, as the trial court correctly concluded, was confined to the expert testimony of Dr. John Craighead, Mobil's expert, and Dr. Victor Roggli, plaintiff's expert. Those two doctors were the only witnesses who provided expert medical testimony regarding the causal link between Mr. Torrejon's exposures and his contraction of mesothelioma.[11] We briefly review their testimony.
Dr. Craighead, a medical doctor who specialized in the fields of pathology and epidemiology, testified at trial by telephone deposition. He testified that in his review of Mr. Torrejon's pathology material he found pleural plaque, which to a reasonable degree of medical probability was caused by asbestos exposure. He diagnosed Mr. Torrejon as having mesothelioma. As to Mr. Torrejon's maritime exposure to asbestos, Dr. Craighead testified:
Q: And Doctor, did you come to understand from your review of the records that Mr. Torrejon had been a Merchant Marine[r] for a period of 10 years?
A: Yes.
Q: And Doctor, was your opinion that Mr. Torrejon was likely exposed to amphibole asbestos during that period of time?
A: Yes. He most probably did sustain some exposure to amphibole perhaps of the amosite type.
Q: And why do you know that Doctor?
A: My general knowledge of the use of amphibole asbestos aboard Merchant Marine vessels in the 1930s.
Q: And Doctor, it was your opinion that within a reasonable degree of medical probability that this exposure was responsible for his mesothelioma, the exposure *889 aboard the merchant marine vessels?
A: This or some other exposure.
Q: When you say this or some other exposure, Doctor, I'm looking at the second page of your report, and it states, "Mr. Torrejon was a Merchant Mariner for a ten year period and there appeared to be ample opportunity for amphibole asbestos exposure aboard ship. It is well known that amosite was used widely aboard merchant vessels in the 1940s and 1950s. With reasonable probability it is my opinion this exposure was responsible for the mesothelioma." Is that what you wrote in your report, Doctor?
A: Yes.
Q: And when you said this exposure, you were referring to his merchant marine exposure, Doctor?
A: Yes.
Q: And Doctor, the presence of a pleural plaque that was found here, would that, did that signify to you that there has been an occupational exposure to asbestos?
A: Yes it does.
Although, as Mobil emphasizes, Dr. Craighead testified that exposures at non-Mobil employment sites could have caused Mr. Torrejon's mesothelioma, he also testified that, on a probability basis, the earlier exposures to asbestos are more likely to contribute to the development of mesothelioma than the later exposures. Finally, he acknowledged that he had no information about the levels of exposures Mr. Torrejon was subjected to at any of his occupational work sites.
Dr. Roggli, who was qualified as an expert pathologist in the field of asbestos-related diseases, testified as an expert for plaintiff. Dr. Roggli testified that he reviewed Mr. Torrejon's medical records and Dr. Craighead's report and deposition. Dr. Roggli testified that he agreed with Dr. Craighead's diagnosis of Mr. Torrejon as malignant mesothelioma, that he agreed pleural plaque was found in Mr. Torrejon's chest wall, and that he agreed that his mesothelioma was caused by exposure to asbestos while he sailed in the merchant marine in the 1940's and 1950's. Dr. Roggli testified that his opinion that Mr. Torrejon's exposure as a merchant mariner was the cause of his mesothelioma was based on several factors; to wit: (i) because they found pleural plaque in Mr. Torrejon's chest wall, (ii) because they found an asbestos body in the slide of his lung tissue, and (iii) because when they studied the common industries that are related to the contraction of mesothelioma, they found that the number two industry associated with the most number of mesothelioma cases in North America was the U.S. Navy/Merchant Marine. Dr. Roggli testified that every exposure above ordinary background level contributes to mesothelioma.[12] As plaintiff pointed out, *890 he also characterized mesothelioma as a dose-responsive disease, meaning that the more a person is exposed to asbestos, the greater the person's risk of contracting that disease.[13]
Both Dr. Craighead and Dr. Roggli opined that Mr. Torrejon's occupational exposure to asbestos caused his mesothelioma, and Mobil stipulated that Mr. Torrejon's mesothelioma was caused by asbestos exposure. Mobil, nonetheless, stresses that it did not stipulate that the Mobil exposures caused Mr. Torrejon to contract mesothelioma. Mobil further stresses that Dr. Craighead testified that the non-Mobil, land-based employment exposures alone could have caused Mr. Torrejon's mesothelioma. Mobil still further stresses that it presented abundant evidence at trial establishing that Mr. Torrejon had significant non-Mobil exposures and de minimus Mobil exposures.
Mobil's argument regarding the nature (Mobil versus non-Mobil) and the extent of Mr. Torrejon's Mobil exposures overlooks the impossibility of medical science to determine exactly which one of a tort victim's multiple exposures caused the victim's mesothelioma. Indeed, causation has been noted to be the "premier hurdle" faced by plaintiffs in asbestos litigation. Brian M. DiMasi, Comment, The Threshold Level of Proof of Asbestos Causation: The "Frequency, Regularity and Proximity Test" and a Modified Summers v. Tice Theory of Burden-Shifting, 24 Cap. U.L.Rev. 735, 738-41 (1995). "The many types of asbestos products, the many possible places of exposure, the lack of direct evidence of particular product exposure, and the possibility of contributing factors have forced the courts to develop various standards of causation." Id. The seminal case addressing this causation problem is Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973).
In Borel, supra, the federal Fifth Circuit applied the substantial factor standard and found cause in fact satisfied based on inferences, reasoning as follows:
[I]t is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to Borel.
Borel, 493 F.2d at 1094. The Borel court further noted that "[w]hether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ." Id.
*891 Similarly, Louisiana jurisprudence has applied the substantial factor standard to determine whether exposure to a particular asbestos-containing product was a cause in fact of the plaintiff's asbestos-related disease. Egan v. Kaiser Aluminum & Chemical Corp., 94-1939 (La.App. 4 Cir. 5/22/96), 677 So.2d 1027, 1035 (citing Quick v. Murphy Oil Co., 93-2267 (La.App. 4th Cir.9/20/94), 643 So.2d 1291). In Egan, we held that "the exposure has to be a substantial contributing factor to the plaintiff's disease." Id. However, the Egan case, as well as the Quick case it cites, were both product liability cases. In contrast, this is a Jones Act case. This distinction is significant in two respects; to wit: First, in a products liability case, the plaintiff is required to prove exposure to a particular manufacturer's product; whereas, in a Jones Act case, the seaman-plaintiff is only required to prove exposure to asbestos aboard the employer's vessel, not whose asbestos. Second, as discussed above, in a products liability case, the plaintiff is required to prove substantial causation; whereas, as discussed below, in a Jones Act case, the seaman-plaintiff is only required to prove slight causation.
The legal standard regarding the level of causation under the Jones Act is different than that required for other torts and under the general maritime law, such as for unseaworthiness and products liability claims. Under the Jones Act, a seaman is only required to prove that the employer's negligence was "a" cause of his injury, regardless of how slight; whereas, under the general maritime law, a seaman is required to prove the traditional tort proximate cause standard. 2 Martin J. Norris, The Law of Seamen § 30:40 (5th ed.2003). This significant distinction was first articulated in the seminal case Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). In Rogers, the Supreme Court reasoned that the test is whether the employer's negligence played any part, "even the slightest" in producing the injury or death for which damages are claimed. The Supreme Court further stated:
Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death.
Rogers, 352 U.S. at 506-07, 77 S.Ct. at 448-49. The Court further noted that "for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the objection of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." Rogers, 352 U.S. at 508, 77 S.Ct. at 449.
The Rogers holding of negligent acts playing any part, no matter how slight, was adopted as "the simple rule of physical causation" to reduce the injured employee's burden of establishing a case under traditional proximate cause standards. Eric Hanson, Recent Development: Gautreaux v. Scurlock Marine, Inc.: The *892 Fifth Circuit Corrects Its "Slight" Mistake and Holds Seamen to a Duty of Ordinary Prudence for Their Own Safety in Jones Act Negligence Cases, 72 Tul. L.Rev. 1023, 1025 (1997)(quoting Page v. St. Louis Southwestern Ry. Co., 349 F.2d 820, 822 (5th Cir.1965)). This burden of proving causation, as the federal Fifth Circuit has characterized it, is "very light" or "featherweight." Bommarito v. Penrod Drilling Corp., 929 F.2d 186, 188 (5th Cir.1991). This featherweight causation standard has been analogized to a "special brand of res ipsa loquitur," which is a rule of permissible inferences from unexplained events. Grant Gilmore and Charles L. Black, Jr., The Law of Admiralty, § 6-36 (2nd ed.1975). The featherweight causation standard is equally applicable when the medical expert evidence does not establish a definite answer as to what caused the plaintiff's injury. Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959)(holding that the jury may draw casual inferences based on varying and inconclusive medical evidence and noting distinction between legal and medical causation).
This featherweight standard, "in common with most workers' compensation statutes, extends common law definitions of legal cause to include precipitation as well as aggravation." Evans v. United Arab Shipping Co. S.A.G., 4 F.3d 207, 210 (3rd Cir.1993). This standard extends traditional views on the limits of legal or proximate cause by recognizing a "broader rippling effect." Id.[14] Applying that featherweight standard here, we find that reasonable minds could not differ that Mobil's negligent exposure of Mr. Torrejon to asbestos was a cause, however slight, of his mesothelioma. At a minimum, it precipitated his contraction of that disease.
Our finding is buttressed by the nature of the disease at issue. Mesothelioma, an unusual, lethal form of cancer, can develop from relatively short, high-intensity exposure to asbestos, as opposed to asbestosis, which develops as a result of relatively high levels of exposure over fairly lengthy periods. Egan, 94-1939 at p. 12, 677 So.2d at 1035. Mesothelioma is a classic example of a signature disease. A signature disease is one which is "extremely rare in the general population but far more prevalent among those exposed to a particular substance; the disease in a sense bears the signature of the substance." Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1251-52 (1987). For this reason, a commentator suggests that the proper approach to causation is to apply "an irrebuttable presumption of causation in mesothelioma cases." Id. As another commentator points out, "[e]ven `easy' toxic tort causation cases are based on statistical correlations, but ones so strong and so exclusive that courts have little trouble believing them." Steve Gold, Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence, 96 Yale L.J. 376, 384 n. 43 (1986)(citing as illustrative the extremely strong link between asbestos exposure and mesothelioma).
The causal link between asbestos exposure and mesothelioma contraction has been demonstrated to such a high degree *893 of probability, while at the same time few if any other possible causes have been identified, that a universal causal relationship had been recognized; to wit: if A is diagnosed as having mesothelioma and A was exposed to asbestos, A's exposure to asbestos is recognized to be the cause of A's mesothelioma. In re Joint Eastern and Southern Dist. Asbestos Litigation, 827 F.Supp. 1014, 1026 (S.D.N.Y.1993), rev'd on other grounds, 52 F.3d 1124 (2nd Cir.1995).
Applying that same reasoning to the undisputed facts in this case leads to the inescapable conclusion that Mobil's exposure of Mr. Torrejon to asbestos was "a" cause of his mesothelioma. In this case, the jury found Mobil negligently exposed Mr. Torrejon to asbestos. The parties stipulated that Mr. Torrejon's mesothelioma was caused by asbestos exposure. It logically follows that Mobil's negligence caused Mr. Torrejon's mesothelioma. A contrary inference is simply not reasonable. Rougeau, 432 So.2d at 1167 (defining a reasonable inference as one that makes the existence of the inferred fact more probable than not and noting that a court has a duty to withdraw a case from the jury when an inference is so tenuous that it rests upon speculation or conjecture).[15] Although a court is bound to give the party against whom a motion for JNOV is brought the benefit of all reasonable inferences that may be drawn from the evidence, a court is not bound by unreasonable inferences. Rougeau, 432 So.2d at 1167.
Summarizing, the trial court's decision granting plaintiff's JNOV motion is supported by the featherweight standard of causation applicable in Jones Act cases, the signature nature of mesothelioma, and the application of logical reasoning to the undisputed facts. We thus affirm the trial court's decision granting plaintiff's motion for JNOV.

FAULT OF SETTLING MANUFACTURERS
Mobil's second assignment of error is that the evidence established the *894 liability of the manufacturers with whom plaintiff settled before trial and that any liability finding against Mobil must be reduced by the percentage of fault attributable to those settling manufacturers. Plaintiff's claims against the manufacturers were based on a strict liability theory and thus required plaintiff to prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Hennegan, XXXX-XXXX at p. 5, 837 So.2d at 102 (citing Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986)). As noted earlier, unlike in a Jones Act case, in a products liability case, the substantial factor test applies to determine whether exposure to a particular asbestos-containing product was a cause in fact of a plaintiff's asbestos-related disease. Egan, 94-1939 at p. 11, 677 So.2d at 1035. A manufacturer does not become liable based on a demonstration of minimal exposure; rather substantial exposure must be established. See Quick, supra. Moreover, the plaintiff is required to establish that the tort victim was exposed to the particular manufacturer's product.
Mobil relies on the testimony of Dr. Richard Lemen, an expert in epidemiology, occupational safety and health, state of the art as it applies to asbestos and the public health effects of asbestos on human beings. Dr. Lemen testified that there was no asbestos-containing product that could be safely used if it released asbestos into a worker's breathing zone. Mobil contends that this testimony by Dr. Lemen that there is no asbestos-containing products that can be used safely satisfied the requirement that it prove the manufacturers' products were unreasonably dangerous. Mobil also relies on Dr. Lemen's testimony to satisfy the requirement that it prove these products caused Mr. Torrejon's injuries. Finally, Mobil relies on the allegations in plaintiff's Arizona complaint to satisfy the requirement that it prove Mr. Torrejon was exposed to the identified manufacturers' products.
Agreeing with plaintiff's argument that Mobil failed to satisfy its burden of establishing liability on the part of the settling manufacturers, the trial court reasoned:
Due to a lack of sufficient evidence regarding the liability of the asbestos manufacturers, apportionment is not warranted.
This Court disagrees with Mobil's contentions and holds that the evidence relied upon is insufficient to establish any other party's liability. The Arizona complaint does not conclusively establish liability because a complaint merely consists of alleged facts that must be proven to the satisfaction of a fact-finder. The testimony of Dr. Lemen alone is insufficient to prove the allegations made in the complaint. Mobil is required to prove that the products were used for their intended purpose and that the danger of the product outweighed their social utility.
We find no error in the trial court's reasoning. Mobil's reliance on plaintiff's allegations in her Arizona complaint to establish Mr. Torrejon's exposure to the settling manufacturers' products is misplaced. "An allegation, admission or confession in a pleading in another suit is an extrajudicial admission and is admissible as evidence, but is not a conclusive presumption and does not operate as estoppel unless the party invoking it has been prejudiced by relying upon it." Cross v. Cutter Biological, Div. of Miles, Inc., 94-1477, p. 21 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, 144 (citing Lakeshore Property Owners Ass'n, Inc. v. Delatte, 524 So.2d 126, 130 (La.App. 4th Cir. *895 1988)). The allegations in plaintiff's Arizona complaint on which Mobil relies are thus insufficient to establish the settling manufacturers' liability.
Given the lack of evidence establishing Mr. Torrejon was exposed to the settling manufacturers' products, we find no manifest error in the trial court's factual finding that Mobil failed to establish liability on the part of the settling manufacturers and that Mobil is liable for all of Mr. Torrejon's injuries. Nonetheless, we expressly adopt the trial court's reasoning that "[e]ven though this Court finds that apportionment is presently not warranted, Mobil may still have a future contribution action against other potential tortfeasors."[16]

GENERAL DAMAGE AWARD
Mobil's final assignment of error is that the general damage award must be reduced by the amounts improperly included in that award for damages not allowed under the Jones Act, i.e., loss of society damages. Although the trial court denied Mobil's motion for new trial on this issue, it amended its reasons for judgment to delete the reference to loss of society damages and to reflect that the general damage award of $1.8 million was solely for Mr. Torrejon's pain and suffering. Mobil contends that the trial court's correction of its erroneous award by simply rewording its reasons for judgment should be reversed. Particularly, Mobil stresses that the trial court at the hearing on its motion for new trial acknowledged that its original $1.8 million general damage award included amounts intended to compensate not only Mr. Torrejon, but also Mrs. Torrejon and the Torrejon children for loss of society damages. Despite that acknowledgement, the trial court refused to reduce the general damage award by the amounts erroneously included in the original award. As a result, Mobil contends that the trial court, in effect, increased the award for Mr. Torrejon's damages by including in the general damage award amounts not recoverable under the Jones Act for loss of society damages.
Plaintiff counters that there was no evidence presented at trial from which the trial court could have made an award for loss of society because the plaintiff only presented evidence as to Mr. Torrejon's pain and suffering. Indeed, the parties stipulated that plaintiff was only "seeking damages for his physical and mental pain and suffering, medical expenses and funeral expenses as allowed under the Jones Act and general maritime law." Plaintiff further counters that although the trial court's original reasons for judgment erroneously referred to loss of society damages, the original judgment simply awarded Mr. Torrejon $1.8 in general damages. Moreover, the trial court judge at the hearing stated that she clearly intended to award that "envelope lump sum" for Mr. *896 Torrejon's general damages. Plaintiff thus contends that the trial court acted within its discretion in clarifying its reasons for judgment to delete the improper reference to loss of society damages and thus correctly denied Mobil's motion for new trial. We find this argument persuasive.
As to the amount of general damages awarded by the trial court, we find no abuse of discretion. Plaintiff established at trial the extreme pain and suffering Mr. Torrejon endured as a result of contracting mesothelioma. Particularly, the trial court stated in its reasons for judgment that:
The record shows that Mr. Torrejon lost over forty pounds, and he was unable to bathe and feed himself, which caused "advanced malnutrition."
Due to his inability to move regularly, Mr. Torrejon suffered sores that created such a terrible smell, charcoal was used to lessen the stench. Mr. Torrejon was prescribed over ninety (90) pills per day, some of which had considerable side effects, including delirium. The record further revealed that Mr. Torrejon suffered excruciating pain in the final months of his life as a result of the mesothelioma.
Given these facts, we cannot say the trial court's award of $1.8 million in general damages was an abuse of discretion.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed to defendant, Mobil Oil Company.
AFFIRMED.
NOTES
[1] These land-based employment exposures were the subject of a separate suit the plaintiff filed in Arizona federal court in July 1995 against twelve manufacturers. The Arizona complaint alleged that Mr. Torrejon was exposed to asbestos-containing products while working as a Merchant Mariner, Machinist, Shipyard Worker, Boilermaker, and Oiler. It further alleged that such products were manufactured by one or more of the named defendants and that Mr. Torrejon's exposure to their products proximately contributed to his asbestos-related disease, mesothelioma. According to the parties, the federal suit was transferred to the Panel for Multi District Litigation and is still pending against several of those defendants.
[2] The perpetuation petition states that Mr. Torrejon had identified from photo albums various asbestos-containing products to which he recalled being exposed. Attached to the perpetuation petition were pictures of the various asbestos-containing products that he recalled being occupationally exposed. Also attached to the petition were copies of pertinent medical records.
[3] This summary also included a listing of the various asbestos-containing products to which Mr. Torrejon recalled being exposed; to wit: A.P. Green  SK-7 and generically; Babcock & Wilcox-Kaowool Cement, Insulation Firebrick, Kaowool blanket; Combustion Engineering  Super 711 Cement, Thermal finishing cement, Pyroscat, and Griptex; Johns-Manville  No. 15 Trishield Combination Pipe Wrap, 85% Magnesia Block Insulation, Thermobestos Pipe Insulation, Asbestos Caulking, Asbestos Caulking Putty, Asbestos Roof Putty, Marinite Garlock-gaskets; and Asbestos Blankets.
[4] Particularly, she alleged that he was exposed to asbestos fibers released from heat and boiler insulation, insulation pads, boiler lagging and jackets, asbestos wallboard and millboard, and other asbestos insulation on the ventilation and pipe systems throughout the vessels. She further alleged that he was exposed to asbestos fibers from asbestos-containing insulation products, including cements, block insulation and pipe covering while engaged in his duties of repairing heating and boiler insulation, applying and removing insulation pads, boiler lagging and jackets, disassembling boiler feed pumps, and applying and removing asbestos wallboard and millboard. She still further alleged that he sustained by-stander exposure to asbestos from the dust created by co-workers in the area and that he was exposed by working, breathing, and living in an area that contained asbestos dust.
[5] The petition included a bibliography of the various articles on the topic of dangers posed by asbestos exposure published in or before the period of time Mr. Torrejon sailed on Mobil's vessels. The petition also stated, and it was established at trial, that Mobil's employee, Captain Fisk, was an active member of the National Safety Council and attended their meetings.
[6] See discussion in Note 1 regarding the Arizona complaint.
[7] The trial court denied plaintiff's directed verdict motion as to whether Mobil satisfied its burden of proof to establish the settling manufacturers' liability.
[8] Given the jury's negative response to the second interrogatory, the jury neither reached the question of fault allocation between Mobil and the settling manufacturers, nor quantified plaintiff's damages.
[9] In 1991, Federal Rule of Civil Procedure, Rule 50 was amended to change the terminology from JNOV and directed verdict to judgment as a matter of law. Martin, XXXX-XXXX at p. 5, n. 5, 784 So.2d at 632.
[10] The Rougeau decision was superceded by statute on another issue, i.e., the use of JNOV on the issue of damages alone.
[11] Mobil's reliance on the testimony of Dr. Francis Weir, an industrial hygienist and toxicologist, that not all exposures to asbestos contribute to disease is misplaced. Dr. Weir's expert testimony was not received as evidence of the cause of death and is not competent evidence for that purpose.
[12] Dr. Roggli's testimony was quoted by the Louisiana Supreme Court in Austin v. Abney Mills, Inc., XXXX-XXXX, p. 5 (La.9/4/02), 824 So.2d 1137, 1141-1142; particularly, the Court stated:

Dr. Roggli concluded that Mr. Hogue [plaintiff] suffers from malignant pleural mesothelioma, well-differentiated papillary epithelial variant, caused by exposure to asbestos. He stated that mesothelioma caused by occupational asbestos exposure is a disease that typically requires twenty years between the first exposure and its appearance upon diagnosis, that each exposure is cumulative in its effect, and that there is no known safe level of exposure to asbestos with respect to the development of mesothelioma.
See also Held v. Avondale Industries, Inc., 95-1788 (La.App. 4 Cir. 4/3/96), 672 So.2d 1106, 1109 (citing Dr. Roggli's testimony that "there is no known level of asbestos which would be considered safe with regard to the development of mesothelioma.")
[13] In Hennegan v. Cooper/T. Smith Stevedoring Co., XXXX-XXXX, p. 8 (La.App. 4 Cir. 12/30/02), 837 So.2d 96, 103, writ denied, XXXX-XXXX (La.4/21/03), 841 So.2d 794, we noted that following regarding the dose-responsive nature of mesothelioma:

Dr. Feingold made an analogy between mesothelioma and severe sunburn. He testified that severe sunburn is also a dose-related injury. Every exposure to the sun, no matter how slight, contributes to the injury. This means that every exposure to the sun, no matter how slight, is a substantial cause of severe sunburn. However, the vast majority of exposures are medically insignificant.
[14] In the analogous workers' compensation context, it has been noted that the causation standard is the same as that of cause in fact under traditional tort law and that the test is whether "but for the conduct or condition, in this case the employment, would the plaintiff have suffered the harm?" Parker v. Employers Mut. Liability Ins. Co. of Wis., 440 S.W.2d 43, 45 (Tex.1969); see Bert Black and David E. Lilienfeld, Epidemiologic Proof in Toxic Tort Litigation, 52 Fordham L.Rev. 732, 741, n. 29 (1984)(noting that "[t]he requirement that a disease be occupational conceptually parallels the tort law causation requirement, but it is not identical to it.")
[15] As an aside, we note a strikingly similar factual scenario to that presented in this case was recently addressed by the English courts; as the House of Lords framed the issue before them:

"If (1) C was employed at different times and for differing periods by both A and B, and (2) A and B were both subject to a duty to take reasonable care to ... prevent C inhaling asbestos dust because of the known risk ... [of] mesothelioma, and (3) both A and B were in breach of that duty ... and (4) C is found to be suffering from a mesothelioma, and (5) any cause of C's mesothelioma other than the inhalation of asbestos dust at work can be effectively discounted, but (6) C cannot (because of the current limits of human science) prove, on the balance of probabilities, that his mesothelioma was the result of his inhaling asbestos dust during his employment by A or during his employment by B or during his employment by A and B taken together, is C entitled to recover damages against either A or B or against both A and B?
Margaret Fordham, Case and Legislation Comment: Causation in the Tort of Negligence  a Dispensable Element?, Fairchild v. Glenhaven Funeral Services Ltd and Others, 2003 Sing. J. Legal Stud. 285. Finding that C was entitled to recover damages against either A or B or both of them, the House of Lords' consensus was that any other outcome would offend justice and fairness. Id. In reaching that result, the court openly acknowledged that its decision involved a variation of the ordinary tort rules of causation. Id. Moreover, the court cited to the American Law Institute, Restatement of the Law, Torts 2d, § 433(3), which provides: "Where the conduct of two or more actors is tortuous, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." See also Jessica Burt, Employers' Liability for Asbestos Diseases: House of Lords Takes a Turn in English Law, 69 Def. Couns. J. 326 (2002).
[16] We find merit to Mobil's contention that the trial court erroneously stated in its reasons for judgment that even if the evidence supported a finding of negligence by any of the asbestos manufacturers, the Jones Act would not allow for apportionment of damages. In Hennegan, supra, one of the cases the trial court cited, we recognized that the liability of a non-settling defendant may be reduced by the proportion of fault assigned to the settling defendants. Likewise, the United States Supreme Court in Norfolk & Western Ry. Co. v. Ayers, 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003), another case the trial court cited, recognized that an employer found liable "bear[s] the burden of identifying other responsible parties and demonstrating that some of the costs of the injury should be spread to them" and that "defendants may be able to implead third parties and thus secure resolution of their contribution actions in the same forum as the underlying FELA actions." Norfolk, 538 U.S. at 165, 123 S.Ct. at 1228, n. 23.